J. S69016/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: ZO.A.R.-E., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Z.R.N., MOTHER, | : : | |
| Appellant | : : | No. 946 EDA 2015 |

Appeal from the Decree Entered March 9, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. 51-FN-003794-2011,
CP-51-AP-0000241-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.A.R.-E., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Z.R.N., MOTHER, | : : | |
| Appellant | : : | No. 1001 EDA 2015 |

Appeal from the Decree Entered March 9, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. 51-FN-003794-2011,
CP-51-AP-0000242-2014

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E. AND OLSON, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED DECEMBER 30, 2015**

Z.R.N. ("Mother") appeals from the decrees entered on March 9, 2015, in the Philadelphia County Court of Common Pleas, Family Court Division, changing the permanency goals for her two dependent minor children,

ZO.A.R.-E.[1] ("Child 1"), born in June of 2011, and Z.A.R.-E. ("Child 2"), born in December of 2009 (collectively, "Children"), from reunification to adoption under Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and involuntarily terminating her parental rights to Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2] We affirm.

The trial court related the relevant facts and procedural history of this case as follows:

> This family became involved with the [Philadelphia] Department of Human Services [("DHS")] on September 28, 2011, when DHS received a Child Protect[ive] Services ("CPS") report alleging that Child 1 had skull fractures, a bruise on the left side of her head and an older bruise on the right side of her head. The report alleged that Mother attended a [w]elfare-to-[w]ork [p]rogram daily, and Children were in the care of Father. The report also alleged that[,] on September 27, 2011, Mother stayed later at her Program, until 8:00 P.M.; that Father called Mother while she was on route to retrieve her Children; that Child 1 was crying in the background; and that [F]ather stated that Child 2 hit Child 1 with a toy. Child 1 had a lump on her head and that Dr. Candice Gollon at Children's Hospital of Philadelphia ("CHOP") did not believe that Child 2 could generate enough force to cause Child 1's fracture. There was a suspicio[n] of abuse. Child 1 was admitted to CHOP, yet the incident was not certified as a near fatality. Mother stated to DHS

---

[1] Due to confusion on the notices of appeal as to the children's initials, the dockets have been corrected.

[2] On October 27, 2014, the trial court, by separate Decrees, involuntarily terminated D.J.E.'s ("Father's") parental rights to Children. He has not filed an appeal from the trial court's decrees, nor is he a party to this appeal.

that she was not at home between 8:00 A.M. and midnight, and that she did not know how Child 1 suffered the injuries. Father stated that when the incident occurred, Children were sitting on a bed at his home; that he had heard a noise and that he believed that Child 2 hit Child 1. Medical staff at CHOP stated that [F]ather's explanation was inconsistent with the severity of Child 1's injuries. DHS performed an assessment that revealed that Children's parents lacked appropriate parenting skills. DHS also learned that Mother had a history of mental health problems and that she lacked stable housing. Mother was residing between her sister's home and [F]ather's home.

Child 1 was hospitalized at CHOP from September 28, 2011 to September 30, 2011. Child 1's injuries included a complex fracture to the back of her head, bruising to her left eye and left ear, a subdural hematoma, and lacerated liver. Children's paternal grandmother took care of Child 1 from September 28, 2011, to September 30, 2011. Paternal grandmother signed a safety plan agreeing to care for Child 1, to meet Child 1's daily needs, and provide supervision for all the visits with parents. Father went to reside in another home. On September 30, 2011, DHS obtained Orders for Protective Custody ("OPC") for Child 1 and Child 2. Children were placed in foster care through NorthEast Treatment Center[s] ("NET") where they currently remain. On October 11, 2011, Children were adjudicated dependent. Children were committed to DHS and Mother was granted supervised visitation. On October 26, 2011, the initial Family Service Plan ("FSP") was developed. Mother's objectives were: to participate in parenting classes on a weekly basis; to understand how [her] behavior resulted in injury to their Children; to learn age appropriate expectation[s] for the Children; to participate in a parenting capacity evaluation and comply with the recommendations made as a result of the evaluation; to complete three job applications and three job interviews; to keep all visits and maintain regular contact with the Children; to meet

regularly with agency social worker[s] and comply with her Individual Service Plan ("ISP"); to sign all needed release forms and authorizations; [to] participate in therapy; and to comply with housing referrals and anger management. Mother attended and signed the FSP.

On February 1, 2012, at a permanency review hearing, the trial court ordered Mother to have unsupervised visitation twice a week in the community. Mother was also ordered to receive a parenting capacity evaluation and re-engage with [Achieving Reunification Center ("ARC")]. On May 8, 2012, Mother's FSP was revised. Mother's objectives were[:] to complete a parenting capacity evaluation; to maintain visitation; to obtain appropriate housing; to participate in meetings regarding the Children; to complete parenting classes; and to complete individual therapy through ARC.

On June 1, 2012, at a permanency review hearing, the trial court found Mother in minimal compliance with her FSP. Additionally, the trial court ordered Mother to comply with the programs at ARC such as therapy, parenting classes, housing, and visits, and a parenting capacity evaluation through [Assessment & Treatment Alternatives ("ATA")]. Mother's visitation remained unsupervised in the community. On September 19, 2012, at a [p]ermanency [r]eview hearing, Mother was found in substantial compliance with her FSP objectives. Mother's visitation remained weekly unsupervised in the community. The trial court found that Mother completed her parenting capacity evaluation on March 12, 2012. The trial court also found that Mother was employed and had suitable housing.

On January 2, 2013, the trial court found by clear and convincing evidence that aggravated circumstances existed as to [F]ather. A finding of [c]hild abuse was also entered against [F]ather. On the same day, at a [p]ermanency [r]eview hearing, Mother was again found in substantial compliance

with her FSP objectives. The court found that Mother did not comply with counseling thr[ough] ARC and still needed appropriate housing. The court found that Mother was living with her mother. Mother's visitation was decreased to supervised visitation. . . . Mother was ordered to have supervised liberal visitation at maternal grandmother's home once clearances were completed, along with one monthly-supervised visit at the agency. On April 3, 2013, at a [p]ermanency [r]eview hearing, Mother was found in substantial compliance with her FSP objectives. Mother's supervised weekly visits were increased to two hours at the agency. The trial court found that Mother re[-]engaged in mental health therapy. On June 19, 2013, Mother's FSP was revised. Mother's FSP objectives were to participate in an updated parenting capacity evaluation; to maintain visitation with the Children; to obtain appropriate housing; to participate in meetings regarding the Children; [and] to complete parenting classes, anger management counseling and a mental health evaluation.

On January 8, 2014, at a [p]ermanency [r]eview hearing, Mother was found in minimal compliance with her FSP objectives. Mother's visitation decreased to weekly supervised [visits] at the agency. The trial court found that Mother was not visiting the Children on a regular basis and did not comply with her mental health services. On May 20, 2014, DHS filed Mother's termination of parental rights petition[s]. On June 4, 2014, at a permanency review hearing, Mother was found in minimal compliance. The trial court found that Mother missed two of her visits. Mother was ordered to have one hour supervised visitation at the agency. On October 27, 2014, Mother was found again in minimal compliance with her FSP objectives. The [trial] court ordered that all services for Mother continue. Mother was referred to [Behavioral Health Services ("BHS")] for consultation and evaluation.

Trial court opinion, 7/9/15 at 1-4 (citations omitted).

On March 9, 2015, the trial court held a permanency review/termination of parental rights hearing, at which DHS social worker, Dania Butler-Todd, and NET social worker, Ivy Lloyd, testified. Ms. Butler-Todd testified at length as to Mother's inconsistency with regard to visitation, detailing how Mother's visits with Children would oscillate between supervised and unsupervised depending upon her domestic circumstances and housing situation. (Notes of testimony, 3/9/15 at 21-25.) She also noted that Mother had attended parenting classes but was not benefiting from the instruction. (*Id.* at 26-28.) Ivy Lloyd testified that Children did not have a parent-child bond with Mother but were bonded to their pre-adoptive foster parents and, thus, would not suffer irreparable harm from the termination of Mother's parental rights. (*Id.* at 46-49.) Further, both Ms. Butler-Todd and Ms. Lloyd testified that termination of Mother's parental rights was in Children's best interest. (*Id.* at 25, 47.)

At the conclusion of the hearing, the trial court issued the two underlying decrees, involuntarily terminating Mother's parental rights to Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. The trial court also changed Children's permanency goals from reunification to adoption under Section 6351 of the Juvenile Act. (*Id.* at 80.) On March 20, 2015, Mother filed simultaneously a timely notice of appeal and a concise statement of errors complained of on appeal, in

accordance with Pa.R.A.P. 1925(a)(2)(i) and (b) with regard to the decrees.

On May 4, 2015, this court entered an order consolidating the appeals.[3]

On appeal, Mother raises three issues for our review:

1. Did the [t]rial [c]ourt err in terminating [Mother's] parental rights under [23 Pa.C.S.A. § 2511(a) and (b)]?

2. Did the [t]rial [c]ourt err in finding that termination of [Mother's] parental rights best served the [C]hildren's developmental, physical and emotional needs under [23 Pa.C.S.A. § 2511(b)]?

3. Did the [t]rial [c]ourt err in changing the [C]hildren's [permanency] goal [from reunification] to adoption?

Mother's brief at vi.

We review appeals from the involuntary termination of parental rights

according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if

---

[3] We note that that there were numerous delays in the trial court. A delay in our receiving the certified record that caused this court to enter an order on May 6, 2015, regarding the filing of the transcript from the permanency review/termination hearing. These delays in the trial court caused our extension of the parties' briefing schedule and, ultimately, delayed this court's disposition of the appeal. *See In re T.S.M.*, 71 A.3d 251, 161 n.21 (Pa. 2013).

the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel-Bassett v. Kia Motors America, Inc.***, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially,

> the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), citing 23 Pa.C.S.A. § 2511.

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009). Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.*, quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 9 -

(1)   The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We need only find the grounds sufficient under one of these sections in order to affirm termination.

***In re T.M.T.***, 64 A.3d 1119 (Pa.Super. 2013).

In her brief on appeal, Mother argues that DHS presented insufficient evidence to sustain its burden under Section 2511(a) and (b), and, thus, that the trial court abused its discretion in involuntarily terminating her parental rights to Children. Specifically, Mother contends that the evidence adduced in no way establishes her settled intent to relinquish her parental

claim or her refusal or failure to perform parental duties, and she avers that the conditions which led to Children's placement have been remedied. In support, Mother emphasizes her progress with regard to her FSP objectives, noting that, "at the time of the hearing, [she] was employed, had housing, was visiting [Children], had completed parenting classes" and a parenting capacity evaluation, and had undergone a mental health assessment, which found her to not be in need of treatment. (Mother's brief at 2.) We disagree.

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008), citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa.Super. 2006). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*Id.*, quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998).

Moreover, this court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." **In re B.,N.M.**, 856 A.2d 847, 855 (Pa.Super. 2004), **appeal denied**, 872 A.2d 1200 (Pa. 2005), quoting **In re C.M.S.**, 832 A.2d 457, 462 (Pa.Super. 2003), **appeal denied**, 859 A.2d 767 (Pa. 2004). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." **Id.**, citing **In re Adoption of Dale A., II**, 683 A.2d 297, 302 (Pa.Super. 1996).

In its Rule 1925(a) opinion, the trial court explained its analysis under Section 2511(a)(1) as follows:

> During the last six months, immediately preceding the filing of the petition[s], Mother has continuously failed to perform her parental duties. . . . DHS developed Mother's goals and objectives as part of her FSP, and Mother was aware of them. Mother's objectives were to participate in parenting classes on a weekly basis to understand how her behavior resulted in injury to her Children; to learn age appropriate expectation for the Children; to participate in a parenting capacity evaluation and comply with the recommendation made as a result of the evaluation; to keep all visits and maintain regular contact with the Children; to meet regularly with the agency social worker[s] and comply with her [ISP]; to sign all needed release forms and authorizations; to participate in mental health therapy; to comply with housing referrals and anger management. . . . Throughout the life of the case, Mother has not achieved her FSP and [ISP] goals.

During the entire year of 2014, Mother was consistently found to be in minimal compliance with her FSP goals and objectives. The trial court found Mother to be minimally compliant on January 8, 2014, June 4, 2014 and October 27, 2014. Mother completed parenting classes on January 26, 2012. Nonetheless, the record established that Mother still lacks appropriate parenting skills, and requires additional parenting classes. The record contains numerous instances of Mother's poor parental skills. On one occasion, after Mother's unsupervised visitation, Mother returned Child 1 to foster parents with a bruise under his eye. Mother knew Child 1 was crawling to the top of the steps when he then tumbled down and hit himself. After Mother's unsupervised visitation, Mother did not return the milk and food provided by Children['s] foster parents and claimed Children did not have anything to eat when she returned the Children to their foster parents. During visitations[,] Mother inspected Children['s] bodies looking for marks without any reasonable basis. Mother also has difficulties when redirecting her Children. The quality of Mother's visitation and parenting ability did not improve, despite Mother having completed parenting classes. As to Mother's understanding her role in Children['s] injuries, the record established that despite being aware of [F]ather's aggressive behavior, Mother regularly risked Children['s] physical integrity by taking them to paternal grandmother's home, while [F]ather was living there. In fact, Mother allowed [F]ather to have unsupervised contact with one of her Children while she was with the other child. Hence, the agency did not know the Children['s] whereabouts as they called the Mother, but she did not answer the telephone. Furthermore, Mother engaged in volatile arguments with [F]ather in front of the Children, which caused them to be very upset.

The record established [that] Mother attended her parenting capacity evaluation on March 12, 2012. Mother was diagnosed with an adjustment disorder and a depressed mood. As part of Mother's parenting capacity evaluation, she was

recommended to stabilize herself, to maintain housing, to find a job and care for the Children without relying on other people. These recommendations mirrored some of Mother's FSP objectives. However, Mother failed to achieve them despite having access to housing and employment services. With regard to Mother's housing, the record revealed that she was evicted and currently lacks stable housing. Likewise, Mother lacks stable employment and is not self-sufficient. Mother only attended ARC housing and financial workshops on September 2014, three months after DHS had filed the termination petition[s]. As to Mother's visitations, she has been very inconsistent and incapable of maintaining unsupervised visitation due to her lack of housing and putting the Children at risk of injury. At the [p]ermanency [r]eview hearing on June 4, 2014, the trial court found that Mother missed two of her visits. Mother has not met regularly with the agency social worker. As to Mother's mental health therapy, she has not successfully completed a program despite being referred for mental health treatment on June 16, 2014, and having access to mental health services. Mother has been in and out of therapy three times. As a result, mental health therapy remains an outstanding objective for Mother. Mother's inability to control her anger has led her to engage in severe arguments with Children's [F]ather with the Children as witnesses. Mother also regularly demonstrate[d] hostile behavior towards DHS an agency's social workers. Mother was also asked to provide documentation of any programs complet[ed] throughout the life of the case, but has failed to do so.

Mother's lack of compliance has continued for at least six months prior to the filing of the termination petition[s]. Mother has failed to achieve her FSP goals during the life of the case. As a result, the trial court found that Mother evidenced a settled purpose of relinquishing her parental claim, and refused or failed to perform parental duties during the six-month period immediately preceding the filing of the

> petition as required by §2511(a)(1) of the Adoption Act. DHS has met its burden of clear and convincing evidence.

Trial court opinion, 7/9/15 at 5-7 (citations omitted).

Having determined that the requirements of Section 2511(a)(1) are satisfied, we proceed to review whether the trial court properly found that termination of Mother's parental rights was in the best interest of Children under Section 2511(b). With respect to Section 2511(b), this court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d [at] 1287 [], this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d [753, 762-763 (Pa.Super. 2008)]. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa.Super. 2010).

In its Rule 1925(a) opinion, the trial court explained its analysis under Section 2511(b) as follows:

> The record established that the Children will not suffer any irreparable harm by terminating Mother's parental rights, and it is in the best interest of the Children to terminate Mother's parental rights.

> Foster parents meet all of the needs of the Children. There is a strong and healthy bond between the Children and the foster parents, and the Children look to them to satisfy their needs. Children look at foster parents as parental figures, while Children look at their Mother simply as a friend. Consequently, Children do not cry when Mother leaves after visitation. Mother has not attended Children's medical appointments. Mother's parental rights are not being terminated on the basis of environmental factors. Children have been in foster care for too long and need permanency.

Trial court opinion, 7/9/15 at 10-11 (citations omitted).

Here, our review of the record indicates that there is clear and convincing, competent, and sufficient evidence to support the trial court's decision that termination of Mother's parental rights best serves Children's developmental, physical, and emotional needs and welfare. Although Mother has expressed a willingness to fulfill her parental duties regarding Children's needs and welfare, her overall lack of progress, over the course of forty-one months, towards alleviating the circumstances which necessitated Children's placement in the first place is illustrative of her inability to do so. As such, we find that it was appropriate for the trial court to determine that the termination of Mother's parental rights would not have a detrimental effect on Children and would be in Children's best interest. In consideration of these circumstances and our careful review of the record, we conclude that the trial court did not abuse its discretion or commit an error of law in finding competent evidence to support the termination of Mother's parental rights to Children under Section 2511(b).

Finally, we address Mother's claim that the trial court committed an abuse of discretion in changing Children's permanency goals from reunification to adoption upon its permanency review.

We review dependency cases according to the following standard:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re: R.J.T.*, 9 A.3d at 1190 (citation omitted).

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301. In determining a petition for a goal change, the trial court must consider:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa.Super. 2007), citing 42 Pa.C.S.A. § 6351(f).

Additionally, Section 6351(f.1) of the Juvenile Act requires the trial court to make a determination regarding the child's goal:

> **(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

. . . .

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

On the issue of a goal change, this court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. **See In re Sweeney**, 574 A.2d 690, 691 (Pa.Super. 1990) (noting that "[o]nce a child is adjudicated dependent. . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." **In re E.F.V.**, 461 A.2d 1263, 1267 (Pa.Super. 1983) (citation omitted).

**In re K.C.**, 903 A.2d 12, 14-15 (Pa.Super. 2006).

In its Rule 1925(a) opinion, the trial court explained the reasoning underlying its decision to change Children's permanency goals from reunification to adoption as follows:

- 19 -

> The record clearly reflects that DHS made reasonable efforts [to assist Mother in achieving her FSP objectives] on October 11, 2011, February 1, 2012, June 1, 2012, September 19, 2012, January 2, 2013, April 3, 2013, November 6, 2013, January 8, 2014, June 4, 2014, October 27, 2014, and March 9, 201[5]. . . . Mother was approved and provided with $1,500 for housing, but after a week she walked away from the house. Mother was also referred to ARC for her housing, job training and mental health therapy. DHS made several calls and emails to Mother, and regular FSP meetings were held. Despite DHS['s] reasonable efforts, and Mother's goals and objectives remaining the same throughout the life of the case, Mother still needs services because she never completed the programs. DHS made reasonable efforts to reunify the Children with their Mother. It was only after Mother's incapacity and reluctance to assume her parental duties that DHS legitimately redirected their efforts toward maintaining the Children in the current adoptive home. It is in the best interest of the Children to be in a home that will keep them safe, provide stability, permanency and comfort. . . . Children need permanency after being in care for more than three years. . . . Today, Mother is unable and refuses to place herself in a reunification position to parent her Children.

Trial court opinion, 7/9/15 at 11-12 (citations omitted).

On this issue, we find there was competent evidence in the record to support the trial court's decision that it was in Children's best interest to have their permanency goals changed from reunification to adoption. As such, we conclude that the trial court did not abuse its discretion in changing Children's permanency goals from reunification to adoption.

Accordingly, for the reasons stated above, we affirm the trial court's decrees changing Children's permanency goals from reunification to adoption

under 42 Pa.C.S.A. § 6351, and involuntarily terminating Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2015